**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ANDREW J. OKULSKI | : | |
| **Plaintiff** | : | |
| v. | : | NO. 20-CV-01328-WB |
| | : | |
| CARVANA, LLC; PAUL BREAUX; | : | |
| KATELYN GREGORY | : | |
| **Defendants** | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR RECONSIDERATION OF THIS HONORABLE COURT'S AUGUST 24, 2020 ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFF'S MOTION FOR LEAVE TO FILE AN AMENDED COMPLAINT**

*"Justice is Truth in Action."  Benjamin Disraeli*

I.    **INTRODUCTION**

Plaintiff files the herein Motion for Reconsideration to correct a clear error of law and fact, prevent manifest injustice and, most importantly, to correct a fraud upon the Court.  Newly discovered evidence establishes each of these bases and makes them crystal clear and indisputable. Motions for reconsideration are permissible when there is a "need to correct a clear error of law or fact or to prevent manifest injustice." Max's Seafood Cafe ex rel. Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).  The Court's decision on Defendants' Motion to Dismiss (MTD) was based on its factual finding that the subject transaction took place entirely online.  In doing so, the Court ignored Plaintiff's specific and sworn allegations that he signed all of the purchase-related records at CARVANA PHILA (Second Amended Complaint, ¶¶ 36-38, 43).[1]  These specific allegations were not in any manner *conclusory* or *conclusory labels* – and are/were rock-

---

[1] No matter what Defendants may say, the term "CARVANA PHILA" is not a pleading fiction or any other type of fiction.  As well-pleaded in Plaintiff's Second Amended Complaint, and as is beyond any reasonable dispute, CARVANA PHILA is a Pennsylvania licensed dealer with a licensed established place of business located at 1043 N. Front Street, Philadelphia, PA 1123 (Second Amended Complaint, ¶¶ 4, 6).  Any contention to the contrary is false, without any reasonable basis in law or fact, and made in bad faith in violation of FRCP 11.

solid truths.  The purchase contracts were signed at CARVANA PHILA.  The transaction was consummated at CARVANA PHILA.

The Court repeatedly and expressly based its decision on its finding that the subject transaction took place online.  The Court expressly based this finding by accepting as true Defendant CARVANA's alleged (but actually non-existent) statements on its Website and in its Annual Reports: "…[t]he transaction took place on line, because Carvana's website and Annual Reports explain, it is an online-only business and consumers 'execut[e] their purchases' digitally… Okulski has offered no authority compelling extension of the BVA's reach to an online transaction that stipulated the Vehicle was being sold by a Georgia dealer. Accordingly, the BVA claim will be dismissed with prejudice." (Court Opinion, 14).  Unfortunately, this finding was in error both legally and factually, against the weight of the evidence and record, and was the result of a fraud upon the Court.

Defendants invited the Court to make exactly this finding.  Defendants submitted exactly this factual assertion – i.e., that the subject transaction and all Carvana transactions take place entirely online.  Defendants submitted exactly this argument – that the Court should ignore plaintiff specific factual assertion and rather adopt a false averment allegedly (cut actually non-existent) from Carvana's Website and Annual Report that all purchases take place online.  Defendants and their counsel must have known that this averment was false and that it was submitted in bad faith without any (reasonable or otherwise) belief in its truth.  See, FRCP 11(b)(3)-(4).  Plaintiff has now put Defendants and their counsel on Rule 11 notice of the falsity of this factual averment and that it must be withdrawn and corrected.[2]

---

[2] To his memory, in more than two-decades of practice, the undersigned has never before had to resort to Rule 11 – but it cannot be avoided in these circumstances.

Defendants' counsel represent all Defendants, including the subject salesperson, Defendant KATELYN GREGORY.   Therefore, they all know very well that Defendant GREGORY presented the contracts to Plaintiff at CARVANA PHILA and that she personally directed and witnessed that Plaintiff signed the contracts at CARVANA PHILA.[3]   Plaintiff has now also obtained two additional CARVANA customer sworn statements that they also signed the purchase agreements at CARVANA dealerships in Pennsylvania (Exhibits B, C).   It must be noted that Plaintiff's counsel has communicated with a grand-total of six Carvana customers and/or their counsel – including Plaintiff Okulski.   Three customers signed the purchase agreements at CARVANA dealerships – not online.   This suggests a high percentage of Carvana deals consummated not online but at Carvana dealerships.   There is, in short, no truth to the assertion that CARVANA transaction all take place on online or that CARVANA is a unique online dealer. Regardless how CARVANA misrepresents itself to investors as something new or different to obtain obscene amounts of financing it is nothing more and nothing less than a national chain of used car dealerships – e.g., J.D. Byrider, DriveTime, Carmax.   All major dealers are marketing and selling vehicles some percentage of vehicle's entirely or almost entirely online.   CARVANA's one and only discernible competitive advantage is that it has heretofore ignored state-based consumer protection and public-safety regulations.   CARVANA has simply supercharged and nationalized the same duplicitous practices – buying damaged and defective vehicles at a premium,

---

[3] The Court seemed also to be swayed by the timing of Plaintiff's discovery of the pre-sale damage some three-months post purchase – which is not at all unusual.  It should be noted that Defendants recently produced additional (incomplete) records, which contain the following notation in one of their pre-sale inspection records: "HOOD MISSALLIGNMENT CHECK FOR DAMNGE [sic.]." The records are still incomplete, unsigned and do not contain any details of the "check" for the results of the check for damage.  So, Defendants insinuated that Plaintiff was lying, while having clear evidence within their possession that the vehicle indeed had front-end damage pre-sale. Defendants throughout have made the calculation that their polish and credentials will lend credibility to their false factual assertions.

performing superficial and slap-dash reconditioning at regional reconditioning centers, and then misrepresenting and selling them at unfair profits.

Respectfully, because the transaction was consummated at CARVANA PHILA, there can be no reasonable argument that the transaction did not involve CARVANA PHILA and/or that all of Pennsylvania's consumer protection and public-safety regulations and statutes applied, including the Board of Vehicles Act/Professions and Occupations Act and Motor Vehicle Sales Finance Act.  Because the transaction was consummated at CARVANA PHILA, CARVANA PHILA was the true seller.  If it was not the true seller, then this represents still other violations. Because the licensing regulations and statutes apply, then it cannot be said that any of the duties arise strictly and solely under the contract.  Therefore, the Economic Loss Doctrine (ELD) and Gist-of-the-Action Doctrine (GOTAD) do not apply.  Likewise, the Parol Evidence Rule (PER) does not apply.

Respectfully, if the Court were to maintain its analysis and holding, then it would vitiate all of the consumer protection and public-safety regulations and statutes, because all any dealer – not just CARVANA – would have to do to escape the application of these regulations and statutes is to insert false facts within the contracts such as the seller is some out of state seller, and/or that the sale took place outside PA or outside of the country -- or outside the Earth or outside the Universe (these latter fanciful stipulations would be no less untrue).  Parties, of course, cannot stipulate to false facts – indeed, the term is actually an oxymoron.  Neither can parties stipulate to the law – at least not in a way that binds any Court or relieves any Court of the responsibility of determining the truly applicable law.  Swift & Co. v. Hocking Valley Ry. Co., 243 U.S. 281, 290 (1917) (Court is not bound by stipulations of counsel).  "The duty of this Court, as of every judicial tribunal, is limited to determining rights of persons or of property, which are actually controverted

in the particular case before it. . . . No stipulation of parties or counsel, whether, in the case before the court or in any other case, can enlarge the power, or affect the duty, of the Court in this regard." California v. San Pablo & Tulare R. Co., 149 U.S. 308, 314 (1893).

With all respect, perhaps the Court was understandably swayed by the Defendants' colorful language and the grandiosity of its pretended revolutionary business model, wealth, their counsel's letterhead or the *ad hominin* attacks against Plaintiff and his counsel. What should be clear by this point is that CARVANA is no better than any other dealer – and quite a bit worse. It is in recognition of this very systemic fraud and misconduct that has plagued the industry very nearly since its inception that the consumer protection and public-safety regulations and statutes were enacted and the Courts have mandated that they must be applied liberally to effectuate their purposes. Exposing the systemic fraud and misconduct in this industry has occupied the majority of the undersigned's professional efforts over the past two decades.

If the Court retains any doubt, then it may Order a hearing. We can call the witnesses, including Defendant GREGORY, and have them testify on the record where the subject and other – probably many, many other – transactions are consummated. Steinfeld v. EmPG Intern, LLC, 97 F.Supp. 606, 611-612 (E.D.Pa. 2015). However, just as the Court accepted Defendants' nebulous, unsworn attenuated Website and Annual Report statements previously, it could accept the specific, sworn statements set forth in Plaintiff's Complaint and attached hereto. Compounding the errors, the Court issued its decision with prejudice. At a minimum, Plaintiff should be permitted to amend to add additional facts that the subject transaction did take place at CARVANA PHILA, and that a significant percentage of CARVANA sales are consummated not online but at the dealer. Phillips v. County of Allegheny, 515 F.3d 224, 228 (3rd. Cir. 2008).

This is a hugely important case with far-reaching consumer protection implications.  If consumers and their sworn allegations are so easily ignored then the whole system is at risk.  If regulated industries and sellers can escape regulation so easily, then everyone will do it.  If defrauders can so easily escape liability for misrepresenting its business and products by simply omitting them and/or including them in their contracts, then fraud and misconduct will run wild – and even more wild within this already particularly plagued industry (which is a truly scary thought).[4]  In this day and age, it is ever more important that the Courts remain at least the one place where the truth matters most without regard for wealth, power, influence or stature.  The Courts are where the *Davids* of the world are still supposed to been given a fair shot at the *Goliaths*.

## II.   <u>STATEMENT OF FACTS</u>

The Court based its MTD decision explicitly on its belief that CARVANA was an online only dealer and that the subject transaction took place online.  The first sentence in the Court's opinion makes this point: "When a used Nissan car Plaintiff Andrew Okulski purchased from <u>an online car dealer</u>, Carvana, LLC ("Carvana")…" (Court Opinion, 1) (emphasis added).  The Court stated explicitly that it was relying on CARVANA's alleged (but actually non-existent) statements in its Website and Annual Reports in support of its belief that the subject transaction and all CARVANA transactions take place online: "…[t]he transaction took place on line, because Carvana's website and Annual Reports explain, it is an online-only business and consumers 'execut[e] their purchases' digitally." (Court Opinion, 2 FN 2); (Court Opinion, 14).  The Court

---

[4] Automotive-related consumer complaints are consistently within the top ten. There were 104,000+ such complaints in 2018. https://www.ftc.gov/system/files/documents/reports/consumer-sentinel-network-data-book-2018/consumer_sentinel_network_data_book_2018_0.pdf.  See also, https://consumerfed.org/wp-content/uploads/2018/07/2017-consumer-complaint-survey-report.pdf (p.5); https://files.consumerfinance.gov/f/documents/cfpb_consumer-response-annual-report_2018.pdf

stated explicitly that it was accepting as true statements, which it termed stipulations, within the contracts that the seller was CARVANA GA and the Title was transferred in GA (Court Opinion, 2-3).

The Court never specifically addressed – much less accepted as true – Plaintiff's specific and sworn allegations that the purchase agreements were signed at CARVANA PHILA (Second Amended Complaint, ¶¶ 36-38, 43).  If these allegations were accepted as true, in accordance with the applicable standard, then the so-called stipulations would have to be rejected for what they are: false and untrue.  The closest the Court comes to addressing Plaintiff's specific, sworn and true allegations that the contracts were signed at and that the seller was CARVANA PHILA was its suggestion that these allegations (facts) were merely conclusory: "While Plaintiff describes these stipulations and the online-only business model as a sham, the Court need not accept such conclusory labels. *See Iqbal*, 556 U.S. at 678 (providing that "mere conclusory statements . . . do not suffice"); *see also Brightwell v. Lehman*, 2006 WL 931702, at *3 (W.D. Pa. April 10, 2006) (noting that 'the court need not accept allegations in the complaint as true where they are contradicted by the documents attached to the complaint')."

However, neither <u>Iqbal</u> nor <u>Brightwell</u> permit a Court to arbitrarily ignore well-pleaded <u>facts</u>, choose to believe Defendants unsworn allegations – especially non-contradictory, conclusory, nebulous, general allegations, or to give Defendant and not Plaintiff the benefit of all reasonable inferences.  <u>Brightwell</u> only stands for the proposition that the Court need not accept "contradicted" allegations.  <u>Id.</u> at *3.  <u>Iqbal</u> only stands for the proposition that the court need not accept "contradicted" or conclusory allegations.  <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  Plaintiff alleging specifically that he signed and therefore consummated the transaction at CARVANA PHILA is not conclusory in any sense.  Moreover, the language Defendants quote

from CARVANA's Website does not say that CARVANA sales only take place online.  At most, it says that CARVANA, like most franchise dealers, has the capacity to do transactions entirely online.  The term "online-only" does not even appear.  Defendant CARVANA's 2019 and 2020 Annual Reports do not contain the term "online-only."  They also do not state that transactions only take place online.  *It is not Plaintiff's allegations that are conclusory, but Defendants'.*  If Defendants persist with their false and fraudulent position that the Annual Reports describe CARVANA as an *online-only* business, and as the Carvana customer Affidavits attached hereto and discussed more fully below attest, there is a clear case of securities fraud for misrepresenting the description of the business in an SEC filing.  15 USC § 78m; 15 USC § 78o; 17 CFR § 229.101.

Defendants and their counsel repeatedly submitted the knowingly false averments that the subject transaction took place online and all CARVANA transactions take place online.

> Plaintiff purchased the Vehicle online through Carvana's website and from Carvana's dealership in Winder, Georgia. (Defendants MOL p. 3)

> Carvana has a unique, online-only business model where customers, including Plaintiff, shop and purchase vehicles entirely online. ("*We're open 24 hours a day so you can buy whenever you want. You are able to use your computer or your phone so you can buy however you want. You also can buy wherever you want, like the comfort of your couch and not a dealership . . . . [C]omplete a purchase and schedule delivery in as little as ten minutes!*").  (Defendants MOL p. 21)[5]

> Indeed, as detailed in Carvana's Annual Reports, Carvana is "a leading e-commerce platform for buying and selling used cars" and, using Carvana's online platform, "consumers can research and identify a vehicle, inspect it using our patented 360-degree vehicle imaging technology, *obtain financing and warranty coverage, purchase the vehicle*, and schedule delivery or pick-up, *all from their desktop or mobile devices*." (Defendants MOL p. 21-22)[6]

---

[5] The language Defendants quote from CARVANA's Website does not say that the CARVANA sales only take place online.  The term "online-only" does not appear.

[6] Defendant CARVANA's 2019 and 2020 Annual Reports do not contain the term "online-only."  If Defendant CARVANA continues with its false and fraudulent position that the Annual Reports describe CARVANA as an *online-only* business, then there is a clear case securities fraud for misrepresenting the business in an SEC filing.  15 USC § 78m; 15 USC § 78o; 17 CFR § 229.101.

Contrary to Plaintiff's assertions, the application for and purchase of the Vehicle was consummated online and not at a particular physical location. Moreover, given this cutting-edge model, Carvana injects regulatory and other certainty into the process by contractually stipulating to the location of sale, and the licensed seller, as it did here. (Defendants MOL p. 22)

Because this transaction took place online and was sold from Carvana's Georgia dealership, this transaction does not constitute business to sell vehicles "within this Commonwealth" within the meaning of the BVA. (Defendants MOL p. 22)

The SAC's allegations and exhibits show that Plaintiff shopped and purchased online, contracted with Carvana's Georgia dealer, and agreed the sale took place in Georgia. (Defendant Reply, 8).

Defendants' counsel represent all Defendants, including the subject salesperson, Defendant KATELYN GREGORY. Therefore, they all know very well that Defendant GREGORY presented the contracts to Plaintiff at CARVANA PHILA and she personally directed and witnessed that Plaintiff signed the contracts at CARVANA PHILA. This was all witnessed by Plaintiff's fiancé, Brittany O'Brien, and she has executed a sworn statement as well (Exhibit F).

As discussed above, the Court accepted and believed that the subject transaction took place online based upon alleged general statements within Carvana's Website and Annual Reports. In so doing, the Court rejected Plaintiff's specific, sworn statements in his Complaint that the transaction took place at and the contracts were signed at CARVANA PHILA.

36.    Plaintiff purchased the subject vehicle in-person from and at CARVANA PHILA.

37.    All of the documents that Plaintiff signed in connection with the subject transaction, including the Buyers Order (BO), Retail Installment Sales Contract (RISC) and Odometer Disclosure Statement (ODS) were prepared by CARVANA PHILA and/or CARVANA GA.

38.    All of the documents that Plaintiff signed in connection with the subject transaction, including the BO, RISC and ODS, were presented to Plaintiff for his signature at Defendant CARVANA PHILA.

43.    Plaintiff signed all of the documents that he signed in connection with the subject transaction, including the BO, RISC and ODS at Defendant CARVANA PHILA.

(Second Amended Complaint).  Respectfully, Plaintiff could have had no reasonable expectation that the Court would ignore these well-pleaded allegations, or decide against the weight of evidence that his allegations were not true.

Plaintiff has now also obtained two additional sworn statements from CARVANA customers swearing to the fact that they also signed and consummated the purchase agreements at CARVANA dealerships in Pennsylvania (Exhibits B, C).  It must be noted that Plaintiff's counsel has communicated with a grand-total of six Carvana customers and/or their counsel – including Plaintiff Okulski.[7]  Of these six total customers, three customers signed the purchase agreements at CARVANA dealerships – not online.  This suggests a high percentage of Carvana deals consummated not online but at Carvana dealerships.  There is no way that Defendants and their counsel are not aware of this reality.  In the one transaction, EFAW (Exhibit C), the contracts also contain the same stipulations to false facts.  This is all part of CARVANA's fraudulent and deceptive standard operating procedures to trick customers and avoid state-based consumer protection and public-safety regulations and statutes.  There is no other reasonable conclusion.

Plaintiff's counsel also now represents another consumer in a very similar case involving the purchase of a misrepresented damaged and defective vehicle from CARVANA PHILA: Roger Burden v. CARVANA (PCCP 2008-1110) (Exhibit A).  Importantly, the Retail Installment Sales Contract (RISC) in Burden identifies CARVANA PHILA as the seller-creditor (Exhibit 3 attached to Exhibit A hereto).  Importantly, however, the Buyers Order (BO) in Burden identifies the seller

---

[7] It is important to note that Plaintiff's counsel is a solo-practitioner with limited time and resources.  Yet, in a short period of time, and with a lot of luck, Plaintiff's counsel was still able to obtain Affidavits from two other Carvana customers who purchased vehicles from CARVANA and signed the purchase agreements at CARVANA's physical, licensed dealer locations in Pennsylvania.  Plaintiff's Counsel has leads on many more and expects to be able to produce many more sworn statements about Carvana deals signed/consummated at the dealer rather than online.

as CARVANA GA (Exhibit 2 attached to Exhibit A hereto).  This shows that the false stipulations

are boundless and not to be accepted.  Importantly, CARVANA has threatened Plaintiff with

sanctions in <u>Burden</u> based on the same false and bad faith averments and are trying to hide behind

the MTD decision they obtained in <u>Okulski</u> based on the same false and bad faith averments

(Exhibit D).

### III.    <u>LEGAL ARGUMENT</u>

#### A.    **STANDARD FOR MOTIONS FOR RECONSIDERATION**

Motions for reconsideration are permissible when there is a "need to correct a clear error

of law or fact or to prevent manifest injustice." <u>Max's Seafood Cafe ex rel. Lou-Ann, Inc. v.

Quinteros</u>, 176 F.3d 669, 677 (3d Cir. 1999); FRCP 60.  The purpose of a motion to reconsider is

"to correct manifest errors of law or fact or to present newly discovered evidence."  <u>Bootay v.

KBR, Inc.</u>, 437 F.App'x 140, 146-47 (3d Cir. 2011) (<u>citing</u> <u>Harsco Corp. v. Zlotnicki</u>, 779 F.2d

906, 909 (3d Cir. 1985)).

In order to be successful on a motion for reconsideration, the movant must demonstrate a

"definite and firm conviction that a mistake has been committed," or that the court overlooked

arguments that were previously made.  <u>United States v. Jasin</u>, 292 F.Supp.2d 670, 676 (E.D. Pa.

2003).  According to the Third Circuit Court of Appeals, "clear error [exists] if 'after reviewing

the evidence, [the court is] left with a definite and firm conviction that a mistake has been

committed.'" <u>Norristown Area Sch. Dist. v. F.C.</u>, 636 F. App'x 857, 861 n. 8 (3d Cir. 2016)

(<u>quoting</u> <u>Oberti v. Bd. of Educ.</u>, 995 F.2d 1204, 1220 (3d Cir. 1993)).  Manifest injustice

"[g]enerally [ ] means that the Court overlooked some dispositive factual or legal matter that was

presented to it."  <u>Rose v. Alternative Ins. Works, LLC</u>, Civ. Action No. 06-1818, 2007 WL

2533894, at *1 (D.N.J. Aug. 31, 2007).  Manifest injustice has also been held to occur where there

is "'an error in the trial court that is direct, obvious, and observable.'" <u>Greene v. Virgin Islands</u>

Water & Power Auth., Civ. Action No. 06-11, 2012 WL 4755061, at *2 (D.V.I. Oct. 5, 2012) (quoting Tenn. Prot. & Advocacy, Inc. v. Wells, 371 F.3d 342, 348 (6th Cir.2004).

In ignoring Plaintiff's specific allegations that the contract signing and consummation took place at CARVANA PHILA, and not online, the Court violated the applicable standard of review.[8] In ruling on a motion to dismiss pursuant to Fed. Rule 12(b)(6), a court must "accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). The Website and Annual reports statements do not contradict Plaintiff's sworn allegations. At most, there is a potential inconsistency. They certainly do not, in any manner, render Plaintiff's specific, sworn and well-pleaded allegations implausible – especially without making an improper credibility determination. There simply was no rational basis within the nature of the competing statements to choose Defendants' side. There was no reasonable basis to make a credibility determination, in effect, to find that Plaintiff was mistaken or prevaricating. Neither Iqbal or Brightwell authorize the Court to arbitrarily reject well-pleaded allegations in favor of inconsistent or even contradictory statements contained in exhibits. The Court may reject conclusory allegations for any reason, including that they are contradicted in an

---

[8] Movants cannot argue that the contract was consummated elsewhere or at another time without admitting still more statutory violations. **A financed motor vehicle transaction is consummated at the time the consumer signs the RISC**. 12 Pa.C.S.A. § 6221(a)&(b). The seller must have already signed at the time the buyer signs. 12 Pa.C.S.A. §(b)(1)&(2) ("The installment seller shall furnish an exact copy of the installment sale contract without charge to the buyer at the time the buyer signs the contract; The buyer's copy of the contract shall contain the signature of the seller identical to the signature on the original contract"). These prescriptions and proscriptions are non-waivable. 12 Pa.C.S.A. § 6234. So, CARVANA cannot submit any further misrepresentation that the contract permits BREAUX to sign later or that the contract is not accepted until he signs. The law is the law. And the law is the law in this circumstance precisely to eradicate these sort of sharp practices. These remedial and public-safety related laws must be liberally construed and applied to effectuate their purposes. Allowing CARVANA to flout dozens of them is not consistent with the law.

attachment.  Bearing in mind that the entire case, and many of Plaintiff's well-pleaded allegations revealed Defendants' lies and deceptions, there was every reason to choose Plaintiff's side. Plaintiff had also established the Defendants had misrepresented its citizenship to obtain diversity jurisdiction in another matter.[9]  In this regard and others, the Court, respectfully, did not accept Plaintiff's well-pleaded allegations as true or accept them in their most favorable light to Plaintiff, and did not give him the benefit of all reasonable inferences, but rather read them in the most favorable light to Defendants and gave Defendants the benefit of all inferences.

In the end, Courts are not supposed to weigh the evidence, but rather are supposed to determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief.  Phillips v. County of Allegheny, 515 F.3d 224, 233 (3rd. Cir. 2008).  A complaint may not be dismissed merely because it appears unlikely that the Plaintiff can prove those facts or will ultimately prevail on the merits.  Id. at 231.  FRCP 8 requires only a concise statement of the claim, including the grounds on which it is based, showing that the pleader is entitled to relief -- this standard does not require "detailed factual allegations."  Id. at 233.  "[I]n the event a complaint fails to state a claim, unless amendment would be futile, the District Court must give a party the opportunity to amend her complaint."  Phillips v. County of Allegheny, 515 F.3d 224, 228 (3rd. Cir. 2008).  Plaintiff, of course, could amend to substantiate that the subject transaction took place not online but at CARVANA PHILA, including providing details about GREGORY presenting

---

[9] See, Richter v. Carvana LLC, 2:17-cv-679 (E.D.Tx. 2017).  In Richter the Plaintiff, a citizen of Texas, filed his Complaint in Federal Court based upon his erroneous understanding that CARVANA LLC was not a citizen of Texas.  CARVANA LLC filed an Answer to the Complaint affirming falsely that it was not a citizen of Texas and that there was Diversity Jurisdiction.  Of course, we know from the instant case that CARVNA, in fact, is a citizen of Texas.  Therefore, there was no complete diversity in Richter.  This cannot be an issue of timing, because the Schrenk Olson Declaration says that the Texas members are pre-IPO employees: *"Two (2) pre-IPO unit holder employees reside in Texas."*  The Carvana IPO took place on 04/28/2017.  The Carvana Answer in Richter was filed November 3, 2017.

the contracts, where within the dealership they were signed, and that this was all witnessed by Plaintiff's girlfriend, Brittany O'Brien – and attach a sworn statement from Brittany O'Brien (Exhibit F).  Plaintiff could also allege that many other customers signed and consummated their purchase not online but at the CARVANA dealerships and attach sworn statements (Exhibits B-C).

## B.   PLAINTIFF'S COMPLAINT SETS FORTH A VALID BOVA/PAOA CLAIM

As argued more fully above, contrary to the Court's decision, the subject purchase and transaction was consummated at CARVANA PHILA.  Therefore, CARVANA PHILA was the seller, and/or CARVANA violated a myriad of regulatory and statutory regulations, including those requiring that PA dealers: operate out of a separate, licensed established place of business, must only sell vehicles they own, all employees involved in any way in any sale must be licensed, contracts must correctly identify the seller, never use any fraudulent or deceptive sale practices (Second Amended Complaint, ¶¶ 164, 167-169, 190).[10]  These duties exist independent of the contract.  They exist whether or not there is a contract.  They exist whether or not the contract may duplicate any of these duties.  Plaintiff need not prove or provide any authority that online transaction are governed by any of the regulations or statutes, because the subject transaction did not occur online.  Any contention to the contrary is false, fraudulent, made in bad faith and reckless.  Likewise, dealers cannot contract themselves out of the licensing and other regulations

---

[10] Defendant CARVANA must also be licensed pursuant to MVSF as an installment seller.  12 Pa.C.S.A. § 6211(a).  A licensee: must identify the name under and address at which it will be doing business, 12 Pa.C.S.A. § 6212(b)(1)&(2); may not operate from any other address unless all records are kept at one address and the seller submits a separate application for each location, 12 Pa.C.S.A. § 6219(a)&(d); must sign all RISCs, 12 Pa.C.S.A. § 6221(a)(3); and must correctly set forth the names and street addresses of all parties to the contract, 12 Pa.C.S.A. § 6222(1).  These requirements are non-waivable.  12 Pa.C.S.A. § 6234.

by including false facts in the contracts.[11]  To so permit dealers would run directly counter to the mandate that remedial regulations and statutes be liberally construed to effectuate their purpose. School Dist. Of Phila. V. WCAB (Hilton), 117 A.3d 232, 242 (Pa. 2015).

The Schrenk v. Carvana, LLC et al., No. 2:19-cv-01302-TLN-CKD, 2020 WL 4339969 (E.D. Cal. July 28, 2020) opinion Defendants submitted supplementally is inapposite, and actually makes the point.  Unlike instantly, in Schrenk there was no evidence that any of the subject transaction were signed/consummated at a Carvana California licensed dealer's licensed established place of business.  In fact, the Schrenk Court found specifically that the Plaintiffs therein "failed to adequately alleged Defendants are a used car dealer within the State of California or that Defendants have conducted sales within the State." Id. at 7.  Instantly, Plaintiff specifically alleged that the subject transaction was signed/consummated in Pennsylvania – and now has produced indisputable evidence that CARVANA regularly conducts sales in PA, including customers signing/consummating the deals in PA (Exhibits A-C, F).

### C.    PLAINTIFF'S COMPLAINT ESTABLISHES PERSONAL JURISDICTION OVER DEFENDANT BREAUX

This is and all the other issues are dictated as the licensing and other regulations and statutes are found to apply.  Respectfully, the Court could not possibly find that Plaintiff consummated the transaction at CARVANA PHILA and still find that the statements within the Transaction

---

[11] Dealers clearly cannot contract themselves out of reach of the licensing regime simply by preparing contracts misidentifying the seller.  That would be absurd.  "It is well settled that a contract which violates a statute is illegal and will not be enforced."  Dippel v. Brunozzi, 365 Pa. 264, 74 A.2d 112 (1950); Pennsylvania R. Co. v. Cameron, 280 Pa. 458, 124 A. 638 (1924); Gramby, et al. v. Cobb, 422 A.2d 889 (Pa.Super. 1980).  "[W]henever it appears that the enforcement of a contract would violate public policy, the court should dismiss the proceedings of its own motion." American Ass'n of Meat Processors v. Casualty Reciprocal Exch., 527 Pa. 59, 67, 588 A.2d 491, 495 (1991) (emphasis in original).

Documents that the sale took place in Georgia were/are still true.  They are mutually, legally and logically inconsistent.

Similarly, the Court found that BREAUX had not personally directed his activities at residents of PA and/or the litigation did not arise out of those activities.  Neither of those findings is tenable.  Because the subject transaction was consummated at CARVANA PHILA, then the licensing and other regulations apply.  Therefore, BREAUX must have knowingly violated the licensing and other regulations in this transaction and many, many others.  Likewise, the Court's finding that BREAUX "did not know the car at issue here was being purchased by a Pennsylvania resident…" is equally untenable.  It has no support in the record.  The contract and other forms BREAUX signed contained Plaintiff's Pennsylvania address.   BREAUX was a signatory to the contract.  As a matter of law, then he is imbued with knowledge of the contents of the contracts – his act of signing is a legal act signifying his knowledge of and consent to contents of the contract. Neel v. Crittenden, 353 Pa. 201, 44 A.2d 558 (1945) (the parties to a contract are presumed to know its contents); Butler Candy Co. v. Springfield Fire and Marine Ins. Co., 296 Pa. 552, 557, 146 A. 135 (1929) (insurer is presumed to know contents of its policies); Central Transp., Inc. v. Board of Assessment of Appeals, 490 Pa. 486, 417 A.2d 144 (1980) (contract is construed against the party who prepared it or for whom it was prepared).  Moreover, by all logic and reason, to infer – especially at the MTD stage -- that a signatory does not know the contents of a contract, would be neither reasonable, nor giving Plaintiff the benefit of all reasonable inferences.  The Court found that BREAUX's robosigning the contracts attenuated his knowledge, responsibility and liability.  The opposite is true.  By authorizing robosigning, BREAUX authorized his signature to placed on all contracts involving CARVANA PHILA and CARVANA PITTSBURGH (1300 Brockwell St, Bridgeville, PA 15017) involving customers, like Plaintiff, with PA addresses.  Any reasonable

inference would include that most of the sales involving CARVANA PHILA and CARVANA PITTSBURGH would also involve PA residents.  Inferring otherwise just is not reasonable.

By his own admission, since 2015, BREAUX has systematically and continuously signed RISCs to sell vehicles to hundreds if not thousands of PA residents through CARVANA's PA licensed dealerships -- activity within and specifically directed to PA for which a license is required. See, 42 Pa.C.SA. § 5322(a)(1)(i),(ii)&(iv); 42 Pa.C.S.A. § 5322(3),(4)&(10).  The question of BREAUX's personal jurisdiction cannot be separated from the licensing issues.  Signing a RISC is as a matter of law negotiating, making an offer, and selling a vehicle – and requires a license in PA.  Any person involved in any aspect of selling one or more vehicles for a PA dealership must be licensed.  63 P.S. § 818.102; 63 P.S. § 818.303(a)(1); 63 P.S. § 818.303(c); 49 Pa.C. § 19.11; 49 Pa.C. § 19.2.  The Legislature has found that the licensing regime is necessary to "[t]o promote the public safety and welfare…" 63 P.S. §818.303(a)(1).

In continuously and systematically conducting specifically defined business activities for which a license is required, BREAUX's "*affiliations with the State are so continuous and systematic as to render [him] essentially at home in the forum State*" and thus subject him to general personal jurisdiction.  Daimler AG v. Bauman, 134 S. Ct. 746, 754 (2014).  Likewise, BREAUX's signing PA RISCs without being licensed to do so on a systematic and continuous basis cannot be said to be random, fortuitous or attenuated.  So, his personal liability and jurisdiction is not based strictly speaking on actions taken in his corporate capacity or for just signing the RISC in the subject transaction, but for perpetrating acts for which he was supposed to be licensed and for violating a myriad of related licensing prescriptions and prohibitions in many PA motor vehicle sales.  The Supreme Court has held that when a controversy is related to or arises out of the contacts purposefully established in the forum state, the forum may constitutionally

17

assert jurisdiction.  <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414, 104 S.Ct. 1868 1872, 80 L.Ed.2d 404 (1984).  Due process is not offended by the assertion of jurisdiction where a defendant has maintained continuous and substantial forum affiliations, whether or not the cause of action is related to those affiliations.  <u>Id.</u> at 414-16, 104 S.Ct. at 1872-73; <u>see</u> <u>also</u>, <u>North Penn Gas Co. v. Corning Natural Gas Corp.</u>, 897 F.2d 687, 690 n. 2 (3d Cir.).

### D.    THE GIST-OF-THE-ACTION DOCTRINE DOES NOT APPLY

Respectfully, the Court's analysis and holding did not address and did not take cognizance of two very important aspects of the transaction and the claims.  One, the application of the licensing and other regulations and statutes and the duties at issue arising thereunder.  Two, Plaintiff made out a claim for <u>fraud in the execution</u> of the contract – i.e., part of the fraud alleged is Defendants' knowing and systematic selling of the vehicle as having undergone a careful 150-point inspection, CARVANA CERTIFIED, and having clean Carfax – all of which became part of the bargain – but omitting these terms from the contract (Second Amended Complaint, ¶¶ 14, 15, 25-29, 54, 55).  **<u>Indeed, perhaps the only thing undisputed in this case is that the subject misrepresentations are NOT contained in the literal text of the RISC – are not included in the physical contract.</u>**  Their omission was part and parcel of the fraud – i.e., fraud in the execution. <u>Toy v. Metro. Life Ins. Co.</u>, 863 A.2d 186, 206 (Pa.Super. 2004).

As mentioned above, because the subject sale was from a PA dealer and at a PA dealer, and thus all of the PA licensing and other regulations apply, then the GOTAD and ELD cannot bar Plaintiff's claims.  The duties at issue do not arise strictly and solely under the contract and they are not inextricably interwoven.  They do not depend upon the contract at all.  The true test is whether the duties, and the claims for the violation thereof, would be determined by any breach of contract claim.  Instantly, Plaintiff need not prevail on his breach of contract claim to prevail on

any of his non-contract claims.  There are unresolved questions of material fact, including whether and what terms, and, in particular, any terms related to certification or accidents or damage, are part of the contract.  Defendants have disputed this.  Defendants' entire justifiable reliance argument is based on the proposition that the misrepresentations about the 150-point inspection, CARVANA CERTIFICATION, denial of any accidents or damage, and/or the false clean CARFAX are NOT part of the contract.

More specifically, all of the duties related to misrepresenting the subject vehicle arise independently under the AITP and UTPCPL:[12] a) Making any substantial misrepresentation of material facts (63 P.S. § 818.318(2)); b) "Make any false promise of a character likely to influence, persuade or induce the sale of a vehicle" (63 P.S. § 818.318(3)); c) "Having engaged in false, deceptive or misleading advertising of vehicles" (63 P.S. § 818.318(6); d) "Having committed any act or engaged in conduct in connection with the sale of vehicles which clearly demonstrates unprofessional conduct or incompetency to operate as a licensee under this act" (63 P.S. § 818.318(7)); e) "Representing that goods or services have sponsorship, approval, characteristics, … uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have." 73 P.S. §201-2(4)(v); f)"Representing that goods or services are of a particular standard, quality or grade.. if they are of another." 73 P.S. §201-2(4)(vii); g) "Advertising goods or services with intent not to sell them as advertised."  73 P.S. §201-2(4)(ix); h) "Engaging in any other fraudulent or deceptive conduct which creates a

---

[12] The Pennsylvania Supreme Court has held repeatedly that the UTPCPL is to be given the broadest application possible. The reach of the UTPCPL extends to conduct occurring outside Pennsylvania.  Danganan v. Guardian Prot. Servs., 179 A.3d 9, (Pa 2018)  (non-Pennsylvania resident could bring suit under UTPCPL based on transactions that occurred out-of-state, based in the plain language of the Law and the fact that it was to be given a liberal interpretation to effectuate its remedial purpose).

likelihood of confusion or of misunderstanding." 73 P.S. §201-2(4)(xxi); i) vehicles offered for retail sale are presumed to be represented to be roadworthy and any condition that renders the vehicle unfit, including, specifically frame/structural damage, must be disclosed (37 Pa.C. § 301.2(5)); j) dealers and salespersons must have a reasonable basis for any statement about the vehicle – whether or not it is contained in the RISC (37 Pa.C. § 301.2(6)).

There are many additional regulatory and statutory duties that were violated that apply specifically to the contract and what must be included and how it must be included: 1) accurately identify seller name and address (12 Pa.C.S.A. § 6211b)(1)&(2); 301.2(1)&(2), 301.4(a)(2)(i)); 2) may not operate from any other address unless all records are kept at one address and the seller submits a separate application for each location (12 Pa.C.S.A. § 6219(a)&(d)); 3) licensed dealer must sign all RISCs (12 Pa.C.S.A. § 6221(a)(3)); 4) must correctly set forth the names and street addresses of all parties to the contract (12 Pa.C.S.A. § 6222(1)). Defendant CARVANA must also be licensed pursuant to MVSF as both an installment seller and sales finance company. 12 Pa.C.S.A. § 6211(a). A licensee: must identify the name under and address at which it will be doing business, 12 Pa.C.S.A. § 6212(b)(1)&(2); may not operate from any other address unless all records are kept at one address and the seller submits a separate application for each location, 12 Pa.C.S.A. § 6219(a)&(d); must sign all RISCs, 12 Pa.C.S.A. § 6221(a)(3); and must correctly set forth the names and street addresses of all parties to the contract, 12 Pa.C.S.A. § 6222(1).[13]

Lastly, there are many duties at issue that exist completely independent of and are not expressed in any way in the contract: a) unlawful for unlicensed salesperson to engage in "<u>any activity related to</u> the buying, <u>selling</u>, or exchanging of a vehicle for a commission, compensation or other consideration") (63 P.S. § 818.303(a)(1); 63 P.S. § 818.303(c); b) "Having committed any

---

[13] These requirements are non-waivable. 12 Pa.C.S.A. § 6234

act or engaged in conduct in connection with the sale of vehicles which clearly demonstrates unprofessional conduct or incompetency to operate as a licensee under this act") (63 P.S. § 818.318(7)); d) (14) "Engaging in the business for which such licensee is licensed without at all times maintaining an established place of business as required" (63 P.S. § 818.318(14)); e) "Employing any person as a salesperson who has not been licensed as required"( 63 P.S. § 818.318(15)); f) "Willfully failing to display a license"( 63 P.S. § 818.318(18))), g) "Willfully having made any false statement as to a material matter in any oath or affidavit which is required by this act" (63 P.S. § 818.318(21)); h) "Violating any provision of this act" (63 P.S. § 818.318(26)); i) "Any violation of the regulations promulgated by the board") (63 P.S. § 818.318(28); j)  "Being a dealer which willfully permits any person who is not a licensed salesperson or owner of the dealership to use the dealer's dealer identification number issued by the Department of Transportation, vehicle dealer's license number or dealer's vehicle registration plates for the purpose of buying, selling or exchanging vehicles" (63 P.S. § 818.318(33)); k) operating "at any other location than authorized by its license" (63 P.S. § 818.318(34)).

Returning to the fraud in the execution claims, by ignoring the fact that the fraud involved omitting the misrepresentations from the contract, and the fraudulent purpose thereof, the Court misapplied the law.  First, parties are permitted to plead in the alternative.  FRCP ((2) *Alternative Statements of a Claim or Defense.* A party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient.").  Second, Plaintiff did, in fact, plead all of his non-fraud counts in the alternative: "This and all subsequent causes of action are pleaded in the alternative and/or in addition to Plaintiff's cause of action for fraud") (Second Amended Complaint, ¶ 192).  Toy recognized a claim for fraud in the execution

"where a party alleges that he was mistaken as to the terms and the actual contents of the agreement he executed due to the other's fraud -- this Court has determined that in Pennsylvania, only fraud in the execution… is excepted from the parol evidence rule's operation. Toy, 928 A.2d at 206.[14] The rationale is instructive and analytically should apply equally to the GOTAD.

> There are several reasons for this distinction. First, the policy that the parol evidence rule aims to serve, which is to uphold the integrity of the written contract because that writing is considered the embodiment the parties' true agreement, see *Rose v. Food Fair Stores, Inc., 437 Pa. 117, 262 A.2d 851, 853 (Pa. 1970)*, is not furthered by a refusal to recognize the fraud in the execution exception, as it is in refusing to recognize an exception for fraud in the inducement. <u>This is so because in the fraud in the execution context, the allegation is that the written agreement *is not* the</u>

---

[14] Lest Defendants argue otherwise, under sound Pennsylvania law, there is no duty for Plaintiff to investigate the misrepresentations, or even to read the contract at all.

> Defendants' position is tantamount to imposing upon such a party a duty to investigate the falsity of the misrepresentations upon which he brings suit, and as such, overrides the law that we have developed over the years for the determination of the element of justifiable reliance in this area. Some time ago, we determined that a party who engages in intentional fraud should be made to answer to the party he defrauded, even if the latter was less than diligent in protecting himself in the conduct of his affairs. See *Emery v. Third National Bank of Pittsburgh, 314 Pa. 544, 171 A. 881, 882 (Pa. 1934)* (quotation omitted) ("'The law is not designed to protect the vigilant alone, although it rather favors them, but is intended as a protection to even the foolishly credulous, as against the machinations of the designedly wicked....'"). In this regard, we consulted the Restatement of Torts, determined that its approach to the element of justifiable reliance coincided with our own, and as we had done before, embraced the rules it set forth. That is, we have relied on the principle that the recipient of an allegedly fraudulent misrepresentation is under no duty to investigate its falsity in order to justifiably rely, but that he is not justified in relying upon the truth of an allegedly fraudulent misrepresentation if he knows it to be false or if its falsity is obvious. *Merritz v. Circelli, 361 Pa. 239, 64 A.2d 796, 798 (Pa. 1949)* (citing Restatement (First) of Torts § 540 for the parameters of the element of justifiable reliance for fraud); See *Neuman v. Corn Exchange Nat. Bank & Trust Co., 356 Pa. 442, 51 A.2d 759, 763 (Pa. 1947)* and *Savitz v. Weinstein, 395 Pa. 173, 149 A.2d 110, 113 (Pa. 1995)* (citing Restatement (First) of Torts § 525 for the elements of fraud); *Gibbs, 647 A.2d at 888*, (citing *Restatement (Second) of Torts § 525* for the elements of fraud). 25 Cf. *Porreco v. Porreco, 571 Pa. 61, 811 A.2d 566 (Pa. 2003)* (plurality) (dissenting, Saylor, J.) (explaining that where a party's reliance is to be justifiable, a party is not under a duty to investigate according to the Restatements of Law of Torts and Contracts). Accordingly, we conclude that Toy was under no duty to read the Policy and the fact that she did not do so does not preclude her from establishing justifiable reliance.

Toy, 928 A.2d at 207-208.

> expression of the parties' true and complete contractual intent inasmuch as terms that
> were agreed to by the parties were omitted from that writing through fraud.

Toy, 928 A.2d at 206 n24 (emphasis added).

Defrauders simply cannot commit fraud in the execution by omitting terms 1) to make a sale and 2) to set up a defense.  There can be no doubt that CARVANA sells its vehicles by representing their good history and quality.  CARVANA admits as much in its Annual Reports: "Confidence in quality.  Auto consumers want to have comfort that the vehicle they purchase is mechanically sound and will not require costly repairs or replacement in the near term" (2019 Annual Report, 5); We believe this technology, coupled with our certification process and seven-day return policy, generates the confidence and trust in our platform needed to buy a car online" (2019 Annual Report, 7).  Part of the fraud is omitting these literal terms from the Contract.  If they were made a literal part of the contract, then Defendants may have some possible grounds for their argument, but where they have intentionally omitted them, as alleged, then no way.  Otherwise, they can quite literally do and say anything to sell a vehicle – upon which a consumer relies and thus the representations are a real and true part of the bargain – and then leave them out of the contract.  Then CARVANA can avoid all liability.  They cannot be pursued as part of a breach of contract action, because they are not part of the contract.  They cannot be pursued as fraud, because they are a part of the bargain.  It is just this type of sharp business practices that the licensing regulations and statutes and AITP, MVSFA and UTPCPL were enacted to eradicate.

Respectfully, to find that the violation of these duties cannot be pursued, because there was a contract under the GOTAD or ELD is irrational to say the least.  It also does not track the applicable law.  "[T]the mere existence of a contract between two parties does not" turn a claim "for injury or loss suffered as the result of actions of the other party in performing the contract" into "one for breach of contract."  Bruno v. Erie Ins. Co., 106 A.3d 48, 69 (Pa. 2014).  Instead, "the

nature of the duty alleged to have been breached, as established by the underlying averments supporting the claim in a plaintiff's complaint, [is] the critical determinative factor in determining whether the claim is truly one in tort, or for breach of contract." <u>Id.</u> at 68 (footnote omitted).  If "the facts establish that the claim involves the defendant's violation of a broader social duty owed to all individuals, which is imposed by the Case law of torts and, hence, exists regardless of the contract, then it must be regarded as a tort." <u>Id.</u> (citations omitted).  The Bruno ???Instantly, the duties arise out of the licensing and other public-safety related regulations and statutes which exist independent to the contract and apply to all individuals.

A car dealer's duty honestly and accurately to represent its vehicles exists separate and independently of any contract.  It arises out of the common law and out of the AITP, UTPCPL and BOVA/PAOA.  This duty was breached as soon as the Defendants' misrepresented the subject the subject vehicle's history and condition.   In fact, the duties under the AITP, UTPCPL and BOVA/PAOA expressly extend to the pre-contractual period – e.g., to advertising, presenting the vehicle, and negotiating.  The analysis should stop there.  Whether and to what extent those duties ended up specifically in the contract is of no moment.  The Bruno Court, in fact, refused to dismiss the insured's Bad Faith Insurance Claim under the GOTAD, because "the duty at issue in that claim is the statutorily created obligation of Erie to have acted in good faith with respect to payment of the Brunos' first party claims for property damage under their insurance policy.  <u>Bruno</u>, 106 A.3d at 71 n18; <u>Reitmeyer; Ash v. Cont'l Ins. Co.</u>, 593 Pa. 523, 932 A.2d 877, 885 (2007) (holding that action against insurer for bad faith conduct pursuant to 42 Pa.C.S.A. § 8371 is for breach of a duty "imposed by law as a matter of social policy, rather than one imposed by mutual consensus"; thus, action is in tort);

The Superior Court of Pennsylvania has held that the "gist of the action doctrine [did] not bar a negligent misrepresentation claim." Dixon v. Nw. Mut., 146 A.3d 780, 789 (Pa.Super.. 2016) (citing Telwell Inc. v. Grandbridge Real Estate Capital, 143 A.3d 421, 429 (Pa.Super. 2016)). In Tellwell, the plaintiff alleged that the defendant both fraudulently and negligently misrepresented the amount of the plaintiff's monthly payment. Tellwell, 143 A.3d at 429-30. The Superior Court reversed the trial court's grant of demurrer in favor of the defendant, finding that the gravamen of the plaintiff's claim sounded in tort because "it implicates the 'societal duty not to affirmatively mislead or advise without factual basis.'" Id. (quoting Bruno, 106 A.3d at 58).

In the case at bar, the fraud in the execution and most of the regulatory violation claims allege that the literal language of the contract is fraudulent in that it omits the fraudulent misrepresentations and that the literal language violates the regulations and statutes. The contract is not only not a shield, but it is the evidence. The Court essentially found that because the misconduct ultimately resulted in a contract and a sale that there can be no tort claims – because there would be no standing or harm without the existence of the contract. That is not the law. If it were the law, then there could be no tort or fraud claims. Respectfully, it would turn the law on its head.

### E.   PLAINTIFF'S CLAIMS ARE NOT SUBJECT TO THE ECONOMIC LOSS DOCTRINE

As argued above, because the duties at issue arise independently of the contract – under the licensing and other regulations and statutes, the ELD simply does not apply. Respectfully, this is not only Plaintiff's position but the position of the Supreme Court of Pennsylvania. With all respect, the Court misconstrued the Dittman v. UPMC, 196 A.3d 1036, 1057 (Pa. 2017) case. The Court held that that Dittman only applied to negligence claims and that it only applied "where 'the plaintiff can establish the defendant's breach of a legal duty arising under common law that is

independent of any duty assumed pursuant to contract." (Court Opinion, 13 FN 7) (quoting Dittman, 196 A.3d at 1038). This Court seemed to further limit Dittman's application to only common law duties. Respectfully, the balance of the Dittman's Cout's analysis and holding is incompatible with either interpretations. As a still recovering but proud Philosophy Major, one lesson has stood the test of time: the true meaning of any proposition – arguments included -- can only be truly gleaned from a full cognizance of its development and organization. Where epistemology is concerned, context is king.

The Dittman Court laid it all out. The Dittman Court examined the ELD generally and fit its holding within a general holding regarding the ELD. There is nothing in the Dittman opinion to support the conclusion that it intended to limit its holding either to negligence claims or independent common law duties. In fact, the Dittman Court recognized specifically that an applicable statutory duty would preclude the ELD. Here are the major development points from the Dittman opinion:

> The crux of the dispute before us is whether the economic loss doctrine as applied in Pennsylvania precludes all negligence claims that seek to recover for purely economic damages, save for specifically delineated and narrow exceptions, or whether such claims are generally permitted provided that a plaintiff can establish a breach of a legal duty independent of any contractual duties existing between the parties. Dittman, 196 A.3d at 1049.

> Most importantly for our current purposes, with respect to application of the economic loss doctrine, the Court looked to the "reasoned approach to the rule" expressed by the South Carolina Supreme Court in *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.,…*, which observed that its application of the "economic loss" rule maintains the dividing line between tort and contract while recognizing the realities of modern tort law. Purely "economic loss" may be recoverable under a variety of tort theories. The question, thus, is not whether the damages are physical or economic. Rather, the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of duty arising independently

of any contract duties between the parties, however, may support a tort action. Dittman, 196 A.3d at 1052.

The Court reasoned that the "economic loss doctrine was well-established in tort law when the [One Call] Act was enacted" and later amended. *[citations omitted]* The Court continued by explaining that "[t]he legislature was presumably aware of the economic loss doctrine when it established the statutory scheme governing the relationship among the entities required to participate under the Act," and found that "our legislature did not intend utility companies to be liable for economic harm caused by an inaccurate response under the Act, because it did not provide a private cause of action for economic losses." *[citations omitted]* In the context of this discussion, the Court cited *In re Rodriguez*, [citation omitted], for the proposition that "courts must assume [that the] legislature understands [the] legal landscape on which it enacts laws, and when [the] common law rule is not abrogated, they must assume it persists."

Having set forth our decisions in *Bilt-Rite* and *Excavation Technologies*, we hold that those cases do not stand for the proposition that the economic loss doctrine, as applied in Pennsylvania, precludes all negligence claims seeking solely economic damages. Indeed, the *Bilt-Rite* Court unequivocally stated that "Pennsylvania has long recognized that purely economic losses are recoverable in a variety of tort actions" and that "a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law." *Bilt-Rite*, 866 A.2d at 288. In so doing, the Court set forth a "reasoned approach" to applying the economic loss doctrine that "turns on the determination of the source of the duty plaintiff claims the defendant owed." *Id.* (quoting *Tommy L. Griffin Plumbing*, 463 S.E.2d at 88). **Specifically, if the duty arises under a contract between the parties, a tort action will not lie from a breach of that duty. However, if the duty arises independently of any contractual duties between the parties, then a breach of that duty may support a tort action**. *Id.* Dittman, 196 A.3d at 1053 (underlining and bold added).

None other than the Dittman Court itself understood the majority's analysis and holding differently from this Court. They did not understand their holding to be limited in any respect. This is how the Chief Justice understood the analysis and holding: "Initially, I respectfully differ with the majority's position that the [ELD] should be essentially removed from the tort arena so long as the duty involved can be categorized as 'existing independently from any contractual obligations between the parties.'" Dittman, 196 A.3d at 1057 (emphasis added).

IV.   **CONCLUSION**

For the foregoing reasons, Plaintiff requests respectfully that this Honorable Court grant his Motion for Reconsideration and enter an Order in the proposed form filed herewith.

**BENSLEY LAW OFFICES, LLC**

*/s/William C. Bensley*
William C. Bensley, Esquire
*Attorneys for Plaintiff*

## **CERTIFICATION OF SERVICE**

I, WILLIAM C. BENSLEY, counsel for Plaintiffs, hereby certify that I filed the foregoing electronically and that all parties have been served via ECF email. I caused to have served a copy of the foregoing by email and via the Court's digital service system upon all counsel of record.


Dated: September 8, 2020                    /s/ WILLIAM C. BENSLEY